UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| TREVOR B.,<br><br>        Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, Commissioner of the Social Security Administration,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER TO AFFIRM THE COMMISSIONER'S DECISION DENYING DISABILITY BENEFITS**<br><br>Case No. 2:24-cv-00971<br><br>Magistrate Judge Daphne A. Oberg |

Trevor B.[1] brought this action for judicial review of the denial of his application for child's insurance benefits by the Commissioner of the Social Security Administration.[2] The administrative law judge (ALJ) who addressed Mr. B.'s application determined he did not qualify as disabled.[3] Mr. B. argues the ALJ erred by failing to properly evaluate (1) the severity of his mental impairments and (2) medical opinion evidence from a provider who conducted an autism assessment.[4] Because the ALJ applied the correct

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in judicial opinions in certain cases, including social security cases, the plaintiff is referred to by first name and last initial only.

[2] (*See* Compl., Doc. No. 1.)

[3] (Certified Tr. of Admin. R. (Tr.) 17–32, Doc. No. 10.)

[4] (*See* Opening Br. 2, Doc. No. 12.)

legal standards and substantial evidence supports his findings, the Commissioner's decision is affirmed.[5]

**STANDARD OF REVIEW**

Section 405(g) of Title 42 of the United States Code provides for judicial review of the Commissioner's final decision.  This court reviews the ALJ's decision to determine whether substantial evidence supports his factual findings and whether he applied the correct legal standards.[6]  "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."[7]

An ALJ's factual findings are "conclusive if supported by substantial evidence."[8] Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is "more than a mere scintilla."[9]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an

---

[5] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. No. 5.)

[6] *See* 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[7] *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citation omitted).

[8] *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotation marks omitted).

[9] *Id.* at 103 (citation omitted).

[10] *Id.* (citation omitted).

administrative agency's findings from being supported by substantial evidence."[11]  And the court may not reweigh the evidence or substitute its judgment for that of the ALJ.[12]

### PROCEDURAL HISTORY AND APPLICABLE LAW

The procedural history of Mr. B.'s applications is complex.  Mr. B. was entitled to child's insurance benefits (CIB) on the earnings record of his deceased father, and he remained entitled to those benefits until he turned eighteen (or longer, if he was disabled or a full-time student).[13]  His mother was entitled to mother's insurance benefits (MIB) as a surviving spouse, so long as Mr. B. was in her care, had not yet turned sixteen, and was not disabled.[14]  But his mother's MIB would have ended when Mr. B. turned sixteen, in September 2021, unless he was disabled.[15]  Accordingly, shortly before Mr. B.'s sixteenth birthday, his mother filed an application to have the Commissioner determine whether he was disabled.[16]  When Mr. B. turned eighteen, this served as Mr. B.'s application for childhood disability benefits—a form of CIB.[17]

---

[11] *Lax*, 489 F.3d at 1084 (citation omitted).

[12] *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

[13] (*See* Comm'r's Br. 3, Doc. No. 18); 42 U.S.C. § 402(d); 20 C.F.R. § 404.350.

[14] (*See* Comm'r's Br. 3, Doc. No. 18); 42 U.S.C. § 402(b)(1)(B), (D), 402(s); 20 C.F.R. § 404.339(e).

[15] (*See* Comm'r's Br. 3, Doc. No. 18); 42 U.S.C. § 402(b)(1)(B); 20 C.F.R. § 404.339.

[16] (*See* Comm'r's Br. 3, Doc. No. 18; Tr. 221–23.)

[17] (*See* Comm'r's Br. 3, Doc. No. 18); 42 U.S.C. § 402(d)(1)(B), (G); 20 C.F.R. § 404.350.  Childhood disability benefits are available to certain adults with qualifying disabilities that began before they turned twenty-two, based on the work record of a deceased parent.  *See* 42 U.S.C. § 402(d)(1)(B), (G); 20 C.F.R. § 404.350.

When adjudicating applications under 42 U.S.C. § 402, such as these, the Commissioner uses the five-step sequential evaluation described in 42 U.S.C. § 423(d) and 20 C.F.R. § 404.1520(a)(4) to determine whether the claimant is disabled—even at age sixteen.[18] The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or last for at least twelve consecutive months.[19] An individual is considered disabled only if his impairments are so severe, he cannot perform his past work or "any other kind of substantial gainful work."[20]

To determine whether a claimant qualifies as disabled, the ALJ uses a five-step sequential evaluation, considering whether:

1) the claimant is engaged in substantial gainful activity;

2) he has a severe medically determinable physical or mental impairment;

3) the impairment is equivalent to an impairment precluding substantial gainful activity (listed in the appendix of the relevant disability regulation);

4) he has the residual functional capacity to perform past relevant work; and

5) he has the residual functional capacity to perform other work, considering his age, education, and work experience.[21]

---

[18] *See* 42 U.S.C. § 402(d)(1)(B), (s)(1).

[19] 42 U.S.C. § 423(d)(1)(A).

[20] *Id.* § 423(d)(2)(A).

[21] *See* 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988).

In the first four steps, the claimant has the burden of establishing disability.[22] And at step five, the Commissioner must show the claimant retains the ability to perform other work in the national economy.[23]

### ALJ'S DECISION

Mr. B. claimed he became disabled in June 2019.[24]  After an administrative hearing,[25] the ALJ issued a decision in December 2023, denying benefits.[26]

At step two of the sequential evaluation, the ALJ found Mr. B. had the following severe impairments: "autism spectrum disorder, depression, a specific learning disorder, and an anxiety disorder."[27]  He also concluded Mr. B. had nonsevere impairments: "sleep difficulties, poor circulation and pain in the feet, and obesity."[28]

At step three, the ALJ found Mr. B.'s impairments did not meet or medically equal an impairment listing.[29]  The ALJ addressed the four areas of mental functioning known as the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and

---

[22] *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).

[23] *Id.*

[24] (Tr. 221–23.)

[25] (*See* Tr. 38–69.)

[26] (Tr. 17–32.)

[27] (Tr. 20.)

[28] (*Id.*)

[29] (Tr. 20–22.)

(4) adapting or managing oneself.[30]  The ALJ found Mr. B. had moderate limitations in all four areas.[31]

The ALJ then determined Mr. B. had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> He can perform simple, goal-oriented but not assembly line-paced work; he can occasionally interact with co-workers and supervisors; he can have brief and superficial interaction with the general public; he can adapt to routine changes in the workplace; and he can perform simple workplace judgements at the workplace.[32]

At step four, the ALJ  found Mr. B. had no past relevant work.[33]  But at step five, based on the residual functional capacity assessment and the testimony of a vocational expert, the ALJ found Mr. B. could perform jobs in the national economy.[34]  Accordingly, the ALJ found Mr. B. not disabled and denied his claim.[35]  This decision became final when the Appeals Council denied Mr. B.'s request for review.[36]

---

[30] (*Id.*)

[31] (*Id.*)

[32] (Tr. 24.)

[33] (Tr. 30.)

[34] (Tr. 30–31.)

[35] (Tr. 31–32.)

[36] (Tr. 1–3.)

6

**ANALYSIS**

Mr. B. raises two claims of error.  First, he argues the ALJ erred in evaluating his mental impairments at steps two and three.[37]  Specifically, he contends the ALJ's evaluation of the "paragraph B" areas mischaracterizes some evidence and omits other evidence that demonstrates more severe limitations.[38]  Second, Mr. B. argues the ALJ erred by failing to properly evaluate medical opinion evidence from Dr. Jackie Nelson, a provider who performed an autism assessment.[39]

### A.  Steps Two and Three

At steps two and three of the sequential evaluation process, an ALJ must rate the degree of limitation resulting from medically determinable mental impairments in four broad functional areas, known as the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.[40]  These criteria are "not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."[41]

---

[37] (Opening Br. 7–9, Doc. No. 12.)

[38] (*Id.* at 8.)

[39] (*Id.* at 9–13.)

[40] *See* 20 C.F.R. § 404.1520a(c)(3); 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00E.

[41] SSR 96-8p, 1996 SSR LEXIS 5, at *13 (July 2, 1996).

The ALJ must rate the claimant's degree of limitation in each area on a five-point scale: none, mild, moderate, marked, or extreme.[42]  As relevant here, a "moderate" limitation means the claimant's ability to function "independently, appropriately, effectively, and on a sustained basis" in the area is "fair."[43]  A "marked" limitation means the claimant's ability to function independently, appropriately, effectively, and on a sustained basis in the area is "seriously limited."[44]  And an extreme limitation means the claimant cannot function in the area.[45]  At step two, a mental impairment is not severe if it results in no more than mild limitations in the paragraph B areas.[46]  At step three, to meet the requirements of "paragraph B" of the mental disorder listings, the claimant must have "extreme limitation of one, or marked limitation of two, paragraph B areas."[47]

As an initial matter, Mr. B. demonstrates no error at step two.  The ALJ found all Mr. B.'s mental impairments (autism spectrum disorder, depression, "a specific learning disorder," and anxiety disorder) severe at this step.[48]  Mr. B. has identified no error in this finding, which was favorable to him.  And he does not challenge the ALJ's finding that his other impairments (sleep difficulties, poor circulation and pain in his feet, and

---

[42] *See* 20 C.F.R. § 404.1520a(c)(4); 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F2.

[43] 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F2.c.

[44] 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F2.d.

[45] 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F2.e.

[46] *See* 20 C.F.R. § 404.1520a(d)(1).

[47] 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F2.

[48] (Tr. 20.)

obesity) were nonsevere.[49]  Moreover, any error at step two is harmless where, as here, the ALJ finds at least one impairment severe and proceeds with the remaining steps of the sequential evaluation.[50]  Accordingly, Mr. B. has shown no error, much less reversible error, at step two.

At step three, the ALJ found Mr. B. had moderate limitations in all four paragraph B areas of mental functioning.[51]  Mr. B. contends the ALJ's evaluation of these areas "contains errors and omits evidence that demonstrates more severe limitation."[52]  Mr. B. specifically challenges the ALJ's evaluation of the first two areas: understanding, remembering, or applying information, and interacting with others.[53]

### 1.  Understanding, Remembering, or Applying Information

The first area of mental functioning "refers to the abilities to learn, recall, and use information to perform work activities."[54]  This includes:

> [u]nderstanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems;

---

[49] (*See id.*)

[50] *See Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) ("As long as the ALJ finds one severe impairment, the ALJ may not deny benefits at step two but must proceed to the next step.  Thus, the failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe.").

[51] (Tr. 20–22.)

[52] (Opening Br. 8, Doc. No. 12.)

[53] (*Id.* at 8–9.)

[54] 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00E1.

sequencing multi-step activities; and using reason and judgment to make work-related decisions.[55]

In assessing this area, the ALJ acknowledged that Mr. B.'s mother reported he had poor memory and difficulty spelling and telling time.[56] But the ALJ noted Mr. B. attended school with special education services and "reportedly [did] very well and earn[ed] good grades."[57] And "[i]n 2021, treating records noted [Mr. B.] had been reading some novels to finish an anime storyline."[58] In those records, Mr. B. "reported he [could] remember what he reads and follow[] the story, but he [did] have to reread paragraphs occasionally due to forgetting what he has read."[59] The ALJ noted mental status exams indicated Mr. B.'s "thought content and thought process [were] appropriate to age with no abnormalities present."[60] Finally, the ALJ stated: "Treating records also note the claimant is good at math and enjoys math because it is rule-based and has absolutes."[61] The ALJ found this evidence "consistent with a moderate limitation in the ability to understand, remember, or apply information."[62]

---

[55] *Id.*

[56] (Tr. 21 (citing Tr. 254, 263).)

[57] (*Id.* (citing Tr. 362, 409, 581).)

[58] (*Id.* (citing Tr. 384, 553).)

[59] (*Id.* (citing Tr. 384, 553).)

[60] (*Id.* (citing Tr. 399, 451, 507, 579.)

[61] (*Id.* (citing Tr. 388, 436, 479, 559, 561).)

[62] (*Id.*)

Mr. B. contends the ALJ inaccurately evaluated the evidence.[63]  First, Mr. B. asserts the ALJ found he was "good at math" based solely on his self-report, when school testing showed otherwise.[64]  Mr. B. notes that in 2021, while he was in tenth grade (two months after he reported being good at math), school testing showed he performed math at a third-grade level, was not proficient, and had a learning disorder in this area.[65]  Mr. B. argues the ALJ ignored objective evidence regarding his abilities in this area.[66]  Mr. B. also challenges the ALJ's assessment that he did well in school generally, noting he struggled to attend school due to social issues and received special education services and accommodations—including help with directions, extended time, a human reader, minimized distractions, and text-to-speech technology to help with schoolwork.[67]

Mr. B. is correct that the ALJ gave flawed reasons for finding moderate limitations in this area.  The treatment records the ALJ cited for the proposition that Mr. B. was good at math merely document Mr. B.'s or his mother's reports.[68]  The ALJ's reliance on these statements is problematic, given the contemporaneous test results showing Mr. B.

---

[63] (Opening Br. 8, Doc. No. 12.)

[64] (*Id.*)

[65] (Tr. 278–79.)

[66] (Opening Br. 8, Doc. No. 12.)

[67] (*Id.* (citing Tr. 369–70).)

[68] (*See* Tr. 388 (Mr. B.'s verbal self-report from 7/15/2021); Tr. 436 (Mr. B.'s mother's verbal report from November 2021); Tr. 479 (duplicate of Tr. 436); Tr. 559 (duplicate of Tr. 388); Tr. 561 (parent assessment from 7/15/2021).)

performed math at a third-grade level.[69]  And the ALJ's reference to Mr. B.'s ability to read "novels" omits the fact that Mr. B. was reading *graphic novels*.[70]

The ALJ's statement that Mr. B. "reportedly [did] very well and earn[ed] good grades" in school with special education services[71] also lacks adequate support.  The ALJ cites three records: the first is a primary care visit record from 2019 (when Mr. B. was fourteen years old), indicating Mr. B. reported doing "well at school" and having "good grades."[72]  But the second record, from 2022, indicates Mr. B. reported "need[ing] extra help in school" and being removed from "regular" school because he was "struggling a lot."[73]  The third record is the 2021 IEP report showing Mr. B. tested "below proficiency" in reading (performing at a fourth or fifth grade level) and math (performing at a third grade level).[74]  While this document states Mr. B. "experienced success in school with special-education services," it also notes he "demonstrated significant . . . weakness in the area of short term working memory" on testing and was "behind students his age in reading and math."[75]  In other words, the ALJ's finding that Mr. B.

---

[69] (Tr. 278–79.)

[70] (*See* Tr. 384, 553 (records from 7/29/2021 doctor's visit).)

[71] (Tr. 20.)

[72] (Tr. 409.)

[73] (Tr. 581.)  The same record indicates Mr. B. was later placed back in "regular" school because he "didn't do any better" at a specialized school.  (*Id.*)

[74] (Tr. 362.)

[75] (*Id.*)

did "very well" in school rests primarily on Mr. B.'s single self-report at age fourteen.  It is contradicted by later self-reports and actual school records—which show Mr. B. performing below proficiency even with special education services.

This leaves the ALJ's statement that mental status exams showed Mr. B.'s "thought content and thought process [were] appropriate to age with no abnormalities present."[76]  While the cited records support this, the same mental status exams document numerous other abnormalities—noting a flat affect, delayed or slurred or monotone speech, slowed and withdrawn behavior, inattentiveness, and a depressed mood.[77]  The ALJ's focus on observations of "normal" thought content provides an incomplete picture of the overall exam findings.  And the ALJ does not explain how "normal" thought content in otherwise abnormal mental status examinations supports his finding of a moderate limitation in the area of understanding, remembering, or applying information.

In sum, when considering only the ALJ's step-three analysis, the ALJ's stated reasons for finding Mr. B. moderately limited in this area lack adequate support in the record.  However, as the Commissioner points out, the record also contains prior administrative medical findings from two state agency psychological consultants, who

---

[76] (Tr. 20 (citing Tr. 399, 451, 507, 579).)

[77] (Tr. 399 (flat affect, delayed speech, slowed behavior); Tr. 507 (inattentive, depressed mood, flat affect, noncommunicative, delayed speech, slowed and withdrawn behavior); Tr. 579 (depressed mood, flat range, monotone and slurred speech).)  Only one of the exams contained overall normal findings.  (Tr. 451.)

both found Mr. B. moderately limited in all four paragraph B areas.[78]  The ALJ evaluated these prior administrative findings in the portion of his decision addressing RFC and found them persuasive.[79]  The ALJ noted the first consultant supported his opinion with a "very thorough explanation and references to the record," and the second consultant included his own explanation as well.[80]  The ALJ found both opinions "consistent with the overall record, including evidence received at the hearing level, which support[s] no more than moderate limitations in all 4 broad areas of mental functioning."[81]

The prior administrative medical findings constitute substantial evidence supporting the ALJ's finding of a moderate limitation in this area at step three, notwithstanding the ALJ's flawed analysis.  While not expressly mentioned in the step-three analysis, it is apparent from his RFC discussion that the ALJ relied on the prior administrative findings in assessing moderate limitations in the paragraph B areas.  And Mr. B. does not challenge the ALJ's evaluation of these administrative findings.  Indeed, after the Commissioner argued in his response brief that those prior findings constituted substantial evidence supporting the ALJ's paragraph B assessment,[82] Mr. B. did not file any reply.

---

[78] (Tr. 71–78, 80–89.)

[79] (Tr. 28.)

[80] (*Id.*)

[81] (*Id.*)

[82] (*See* Comm'r's Br. 7, Doc. No. 18.)

14

Further, as the ALJ noted, the consultants provided thorough explanations for their findings, consistent with the evidence.[83]  Notably, the consultants specifically discussed Mr. B.'s 2021 IEP report, noting it showed Mr. B. had "limitations in reading comprehension and math"—reading at a fourth or fifth grade level and performing math at a third grade level.[84]  The consultants also discussed in detail Dr. Nelson's autism assessment and other treatment records.[85]  The first consultant found, considering the autism assessment and "school evidence, mother's allegations, and treatment notes," that Mr. B. had moderate limitations in the paragraph B areas[86]—and the second consultant agreed.[87]  The ALJ did not err in finding the consultants' opinions well-supported and consistent with the record.  These persuasive prior administrative findings constitute substantial evidence supporting the ALJ's step-three finding of moderate limitation in this area.[88]

---

[83] (*See* Tr. 73–74, 81–85.)

[84] (Tr. 74, 84.)

[85] (*See* Tr. 73–74, 81–85.)

[86] (Tr. 74.)

[87] (Tr. 85.)

[88] *See Tina W. v. Comm'r*, No. 24-4029, 2024 U.S. App. LEXIS 32171, at *3–4 (10th Cir. Dec. 19, 2024) (unpublished) ("We may overturn the ALJ's findings under the substantial evidence standard 'only where there is a conspicuous absence of credible' evidence to support the findings or 'no contrary medical evidence' to refute a claim of disability." (quoting *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992))).

Because substantial evidence supports the ALJ's finding of a moderate limitation in understanding, remembering, or applying information, Mr. B. has not demonstrated this finding was erroneous.

### 2. Interacting With Others

The second paragraph B area, interacting with others, "refers to the abilities to relate to and work with supervisors, co-workers, and the public."[89]   This includes:

> cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.[90]

The ALJ acknowledged Mr. B.'s mother's reports that Mr. B. had communication difficulties, had no friends his own age, had difficulty making eye contact, and self-isolated at times.[91]   The ALJ noted Mr. B.'s speech delay and speech therapy, but observed "relevant records suggest [Mr. B.'s] speech is intelligible although he speaks quietly."[92]   The ALJ also noted occupational therapy records from 2021 indicated Mr. B. socialized during online game play.[93]   And the therapist indicated Mr. B. participated in reciprocal conversation and asked more follow-up questions than he had in earlier

---

[89] 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00E2.

[90] *Id.*

[91] (Tr. 21 (citing Tr. 243–44, 246, 252–53, 255, 263).)

[92] (*Id.* (citing Tr. 385, 436, 444).)

[93] (*Id.* (citing Tr. 822).)

therapy sessions.[94]  The ALJ also pointed to occupational therapy records from 2023 indicating Mr. B. had "demonstrated progress in his leisure and socialization goals."[95] And in one session, Mr. B. "reportedly demonstrated a good ability to converse with a new person" and asked "4 questions from memory."[96]  The ALJ found this evidence "consistent with a moderate limitation in the ability to interact with others."[97]

The ALJ's description of this evidence is accurate and supported by the records cited.  But Mr. B. contends other evidence shows he was more limited in this area than the ALJ's analysis suggests.[98]  As explained below, Mr. B.'s argument amounts to a request to reweigh the evidence, and he has demonstrated no error in the ALJ's assessment.

First, Mr. B. asserts he needed "multiple [therapy] sessions to even get to the point where he could order a sandwich at Subway" with his father present, and he states this took "more than a year."[99]  He cites his mother's testimony and a 2023 occupational therapy record,[100] which noted this as an example of "good progress

---

[94] (*Id.* (citing Tr. 822).)

[95] (*Id.* (citing Tr. 748).)

[96] (*Id.* (citing Tr. 798).)

[97] (*Id.*)

[98] (*See* Opening Br. 8–9, Doc. No. 12.)

[99] (*Id.* at 8–9 (citing Tr. 65, 651).)

[100] (*See* Tr. 65 (Mr. B.'s mother's testimony that the therapist "had him go . . . to Subway because he likes Subway and order his own sandwich and we finally got him to do that

towards established goals."[101]  But neither the testimony nor the therapy record indicate this took multiple sessions or more than a year.  In any case, the additional evidence Mr. B. cites does not contradict the ALJ's observation that occupational therapy records showed progress in socialization goals.

Next, Mr. B. contends the "new person" he conversed with was actually a therapist he had been seeing for eighteen months.[102]  But the ALJ did not misstate the record: according to the therapy note, Mr. B. "demonstrated good ability to converse with a new person (PRN therapist)."[103]  And the record at issue shows this therapist was different than the one who regularly treated Mr. B.[104]  In other words, it appears the "new person" was a therapist who treated Mr. B. for a single session.  Mr. B. cites no evidence supporting his assertion that the "new person" was a therapist he had seen for eighteen months.  Accordingly, the ALJ's statement about Mr. B. conversing with a new person accurately reflects the record.

---

one time," but his stepfather was there "in the background"); Tr. 651 ("Parent reports the client was able to order his sandwich when out at a restaurant over the past week.").)

[101] (Tr. 652.)

[102] (Opening Br. 9, Doc. No. 12 (citing Tr. 798).)

[103] (Tr. 798.)

[104] (*See* Tr. 796–804 (record from 1/3/2023 occupational therapy session with Aubrianne Evans); Tr. 641–795, 805–41 (records from occupational therapy sessions with Alexa Sybrowsky from 11/8/2022 to 5/2/2023).

Mr. B. also contends evidence of progress in a therapeutic setting does not establish he is capable of interacting with others in a competitive work environment.[105] But the therapy records the ALJ relied on also noted progress in socialization goals outside a therapeutic setting.[106] And Mr. B. cites no authority supporting the notion that an ALJ cannot rely a claimant's abilities in a therapeutic setting to assess the claimant's functional limitations. Agency regulations require ALJs to consider "all relevant evidence" in assessing the paragraph B areas, including how treatment affects a claimant's functioning.[107] The ALJ's reliance on Mr. B.'s therapeutic progress is consistent with this requirement.

Overall, the ALJ accurately described the available evidence and reasonably found it consistent with a moderate limitation in interacting with others. The prior administrative medical findings also support the ALJ's assessment, as explained above. The evidence the ALJ cited in his step-three analysis and the prior administrative findings, taken together, constitute substantial evidence supporting the ALJ's finding of a moderate limitation in this area.

Mr. B. does not challenge the ALJ's evaluation of the other two paragraph B areas. Accordingly, Mr. B. has demonstrated no error in the ALJ's findings at steps two or three of the sequential evaluation.

---

[105] (Opening Br. 9, Doc. No. 12.)

[106] (*See* Tr. 748 (noting "some progress" in leisure and socialization goals); Tr. 822 (noting Mr. B. socialized during online game play).)

[107] 20 C.F.R. § 404.1520a(c)(1).

B. <u>Medical Opinion Evidence</u>

Mr. B. next argues the ALJ failed to properly evaluate medical opinion evidence from the provider who performed an autism assessment, Dr. Nelson.[108]

In determining a claimant's RFC, an ALJ must assess the persuasiveness of medical opinions and prior administrative findings, based on the following factors: (1) supportability (the objective medical evidence and supporting explanations presented by the medical source); (2) the consistency of the opinion with evidence from other medical and nonmedical sources; (3) the relationship with the claimant (including its length, frequency, purpose, and extent—and whether it was an examining relationship); (4) any specialization; and (5) any other relevant factors.[109]  The most important factors are supportability and consistency, and the ALJ must explain how he evaluated both factors.[110]

Jackie Nelson, PsyD, performed an autism evaluation of Mr. B. in November 2021.[111]  She diagnosed Mr. B. with "Autism Spectrum Disorder, Social Communication Level 1, Restricted Interests Level 1."[112]  Dr. Nelson provided treatment recommendations in a December 2021 letter.[113]  And she provided a June 2022 letter

---

[108] (Opening Br. 9–13, Doc. No. 12.)

[109] 20 C.F.R. § 404.1520c(b), (c)(1)–(5).

[110] *Id.* § 404.1520c(b)(2).

[111] (Tr. 433–46; Tr. 476–89 (duplicate).)

[112] (Tr. 442.)

[113] (Tr. 447.)

containing opinions regarding Mr. B.'s functional limitations.[114]  Mr. B. challenges the ALJ's evaluation of the June 2022 letter.[115]

The ALJ acknowledged Dr. Nelson's opinions that Mr. B. had "marked (60% of the time) difficulty in acquiring and using information; marked difficulty (70% of the time) in attending and completing tasks; extreme difficulty (95% of the time) interacting and relating to others; and extreme difficulty (90% of the time) caring for himself."[116]  But he found these opinions unpersuasive.[117]  Although the ALJ noted Dr. Nelson "support[ed] these opinions with her own exam and with examples," he found it "unclear whether the examples provided apply to the claimant."[118]  The ALJ added that "Dr. Nelson's own assessment and diagnosis of level 1 autism appear[] inconsistent with marked and extreme limitations."[119]  As the ALJ explained, "Dr. Nelson documented the claimant's total scores fell into a moderate level."[120]  Further, Dr. Nelson noted Mr. B. did not "utilize any stereotyped or idiosyncratic use of words or phrase[s] although [he] engaged

---

[114] (Tr. 471.)

[115] (*See* Opening Br. 11–12, Doc. No. 12.)

[116] (Tr. 29 (citing Tr. 471).)

[117] (*Id.*)

[118] (*Id.* (citing Tr. 471).)

[119] (*Id.* (citing Tr. 471).)

[120] (*Id.* (citing Tr. 481).)

in limited back-and forth conversation."[121]  And "Dr. Nelson documented [Mr. B.]

seemed a bit shy, but was also willing to participate."[122]

Mr. B. first challenges the ALJ's statement that it was not apparent whether Dr.

Nelson's examples applied to Mr. B.[123]  He contends it is "clear" the examples applied

to him.[124]  But the ALJ reasonably characterized Dr. Nelson's letter as unclear on this

point.  Under each limitation, Dr. Nelson provided a bullet-point list which did not

specifically reference Mr. B.—for example:

1.  Acquiring and using information *(Marked Difficulty, 60% of the time)*
    - Inability to remember important things learned in school the day before
    - Difficulty with math problems
    - Difficulty explaining what you mean, and
    - Only speaking in short, simple sentences.[125]

The ALJ reasonably concluded it was unclear whether the bullet-point examples applied

to Mr. B. or merely reflected what a "marked difficulty" might generically entail.  The

examples listed for the other functional areas were similarly vague, including: "[f]ailure

to complete tasks that interest the person," "[n]ot having close friends or friends that are

the child's age," and "[u]nable to physically care for themselves day to day."[126]  None of

---

[121] (*Id.* (citing Tr. 481).)

[122] (*Id.* (citing Tr. 481).)

[123] (Opening Br. 11, Doc. No. 12.)

[124] (*Id.*)

[125] (Tr. 471.)

[126] (*Id.*)

the bullet-point examples expressly referenced Mr. B. or specific findings from Dr. Nelson's examination.[127]  Mr. B. argues "[a]ll of these issues are noted in the medical record, as well as school records."[128]  But the supportability factor considers the "supporting explanations *presented by [the] medical source*."[129]  In assessing this factor, the ALJ reasonably noted Dr. Nelson failed to specify whether her examples applied to Mr. B.

Mr. B. next challenges the ALJ's statement that Dr. Nelson's opinions regarding marked and extreme limitations were inconsistent with a diagnosis of "level 1" autism.[130] Mr. B. asserts it was inappropriate for the ALJ, who is not a medical provider, to speculate regarding the import of a medical diagnosis.[131]  But Dr. Nelson's examination report included a detailed description of the different "severity" levels, with level 1 being the least severe.[132]  Notably, Dr. Nelson defined levels 2 and 3 to include "severe," "extreme," or "marked" deficits.[133]  But she did not use these terms to describe a level 1

---

[127] (*See id.*)

[128] (Opening Br. 11, Doc. No. 12.)

[129] 20 C.F.R. § 404.1520c(c)(1) (emphasis added).

[130] (Tr. 29; Opening Br. 12, Doc. No. 12.)

[131] (Opening Br. 12, Doc. No. 12.)

[132] (Tr. 442–43.)

[133] (*Id.*)

diagnosis.[134]  Given Dr. Nelson's own descriptions of the severity levels, the ALJ did not err in remarking on the apparent inconsistency between the level 1 diagnosis and Dr. Nelson's opinion of marked and extreme limitations.  Further, the ALJ did not solely rely on the level 1 diagnosis; he also found Dr. Nelson's opinions inconsistent with other aspects of her assessment.  For example, he noted that Dr. Nelson described Mr. B.'s scores as showing a "[m]oderate level of ASD characteristics"; she did not observe "stereotyped or idiosyncratic use of words or phrases"; and she described Mr. B. as shy but willing to participate.[135]  The ALJ reasonably concluded both the level 1 diagnosis (as Dr. Nelson described it) and other aspects of the autism assessment were inconsistent with Dr. Nelson's opinions.

The record shows the ALJ applied the correct legal standards in evaluating Dr. Nelson's opinions, including articulating how he considered supportability and

---

[134] (Tr. 443.)  The report identifies level 1 as "requiring support," and includes the following description:

> Without supports in place, deficits in social communication cause noticeable impairments. Difficulty initiating social interactions, and clear examples of atypical or unsuccessful responses to social overtures of others.  May appear to have decreased interest in social interactions.  For example, a person who is able to speak in full sentences and engages in communication but whose to-and-fro conversation with others fails, and whose attempts to make friends are odd and typically unsuccessful[.]

> Inflexibility of behavior causes significant interference with functioning in one or more contexts. Difficulty switching between activities.  Problems of organization and planning hamper independence.

(*Id.*)

[135] (Tr. 29, 481.)

consistency, as required.  And the ALJ's stated reasons for finding her opinions unpersuasive are supported by the record.  Accordingly, Mr. B. has shown no error in the ALJ's evaluation of Dr. Nelson's opinions.

## CONCLUSION

The Commissioner's decision is affirmed.

DATED this 30th day of March, 2026.

BY THE COURT:

_Daphne A. Oberg_
Daphne A. Oberg
United States Magistrate Judge